## THE BALTIMORE.

(Circuit Court of Appeals, Fourth Circuit. May 25, 1907.)

No. 686.

COLLISION—STEAMER AND SCHOONER—FAILURE TO SHOW PROPER LIGHTS.

A schooner *held* in fault for a collision with a steamer in Chesapeake Bay in the night, on the ground that, while becalmed, she had been drifted around by the tide so that the steamer was an overtaking vessel, and could not see her side lights, and she failed to exhibit any white light or flare-up astern as required by the rules, although the steamer was seen approaching for a considerable time before the collision.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 105–116.

Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

Appeal from the District Court of the United States for the District of Maryland.

The following is the opinion of the District Court by Morris, District Judge, delivered orally:

This collision occurred in the Chesapeake Bay about 11 o'clock at night, December 19, 1905, some four miles to the north of Point-No-Point. The night was dark, but the atmosphere was clear, except for a slight haziness on the surface of the water. The schooner was a small and very old vessel of about 55 tons, loaded with lumber. The deck load extended three or four feet outside her hull and up to the foremast, and was about four feet in height above the deck. She was on her way up the bay, having come out of the Rappahannock river the day before. The steamer Baltimore, a large passenger steamer of the Chesapeake Steamship Company, had left Baltimore at 5 p. m. on her regular trip to West Point on the York river. She was proceeding south by E. ¼ E. down the bay in the usual track of steamers of her class. The case stated for the schooner in her libel is that the schooner was on her port tack with the wind very light from N. N. W. with hardly sufficient headway for steerage, making a course N. N. E., that the lookout reported the steamer's headlight an hour before the collision, and that the schooner held her course and watched the lights of the steamer until in a short time, without change of course, the steamer ran into the schooner, striking her on her port side forward of the fore rigging, cutting off the fore part of the schooner and carrying away her foremast, fore rigging, foresail and fore topmast, and so injuring her that she filled at once, carrying down one of her crew who was in the forecastle, and who was drowned.

The case for the steamer, as stated in her answer and cross-libel, is that she was proceeding at her usual speed of 12 miles an hour with her second officer on duty in the pilot house, a quartermaster at the wheel, and a lookout forward near the stem; that the first they saw was the bow light of the steamer reflected on the sails of the schooner directly in front of the steamer, less than 100 feet distant, and heading southeast in such a direction that her side lights could not be seen from the steamer and that no white light or flare-up was exhibited to the steamer over her stern; that the reflection was reported by the lookout and seen by the second officer at the same moment; that the second officer at once rang for full speed astern, but before the steamer's headway was checked her stem struck the schooner on the port side, forward of the foremast, and cut away the schooner's bow, without disturbing the deck load. The fault charged against the schooner is not having displayed a white light or flare-up on the schooner's stern, in compliance with article 10 of the act of Congress of June 7, 1897 (30 Stat. 96, c. 4 [U. S. Comp. St. 1901, p. 2879]), she being the overtaken vessel. The course of the steamer I take to be established as south by E. ¼ E.: that was the proper and usual course for her. and there is no reason to doubt the steamer's witnesses that it was the course

of the steamer that night. The schooner's witnesses gave her heading as N. N. E., and the pinch of the case is the correctness of the schooner's contention as to her heading.

In the first place, it may be well to consider the relative possibility of want of vigilance on the part of those on watch on the respective vessels. The crew of the schooner consisted of the master (who was also the owner) and three colored men. The master for some time before the collision was below in the cabin and the colored mate had the wheel. There was a young colored man as lookout standing on the deck load at the port forerigging. The lookout was also cook during the day, and the mate had been on duty nearly all Monday and Monday night, and had but short intervals of rest on Tuesday. The steamer had left Baltimore only five hours before; the lookout had been on watch only one hour and the second officer since 6 o'clock. The mate and lookout on the schooner testify that they saw the steamer's light a very long distance off, and that she continued to approach directly toward the schooner, but the mate did not call the master, who was just below him in the cabin, and the lookout did not call up the man who was asleep in the forecastle just under him. That the mate did not call the master is certainly significant and leads to the inference that, after the two men on the schooner first saw the steamer, they were too drowsy to watch her, and too stupid with weariness to do anything.

The important question is the heading of the schooner. In the schooner's libel and in the testimony of the two men on her deck and of her master it is said that the wind was N. N. W. and the schooner's heading N. N. E., but it is also stated that the wind was so light that the schooner did not have steerageway. If the wind had been as they state, N. N. W., and sufficient for steerageway, the schooner could not have made a course N. N. E. It would be impossible for a schooner of this class with a heavy deck load piled four feet, in a very light wind hardly sufficient for steerage, to keep a course four points off the wind. That may have been her heading when those on the schooner first saw the steamer's light, but there was no reason why she should keep that heading. The fact was that the schooner was becalmed and was keeping no course at all, but was drifting. The tide since 8 o'clock had been flooding and setting her up the bay, and that current acting with most force on her stern, which was deepest in the water, would carry her stern to the northward and set her bow more and more to the eastward and southward. As to the wind, if there was at that time any wind, I am satisfied that the preponderance of proof is that it was not from the N. N. W., but to the east of north, what there was of it. I am satisfied that, whatever may possibly have been the heading of the schooner when those on her deck say they first saw the steamer to the northwest off their port bow, that before the steamer had approached near enough to see the schooner's port light, the schooner's head, under the influence of the tide, had come around until she pointed at least southeast. In that relative situation, the schooner's port light could not be seen from the steamer. The schooner was then the overtaken vessel, and was under obligation to exhibit a bright light or flare-up from her stern.

The second officer and lookout of the steamer appear to have been vigilant, and there does not appear to me to be any way of accounting for their not seeing the schooner's port light, except that the schooner had drifted around so as to bring her port light abaft her beam to the steamer. It is urged in behalf of the schooner that the character of the wound is not consistent with a blow from the stern. The effect of a blow given by one vessel to another in collision cases is often surprising, and is not an altogether safe premise to argue from. Both vessels are moving and both yield to the impact. In this case the blow was just forward of the deck load. The bow of the schooner was cut off and the deck load but slightly moved. If the blow had come from forward, more in the direction toward the schooner's stern, it seems probable, as the steamer was going full speed, that the steamer would have brought up against the deck load and carried the schooner with her and have forced her open, rather than have sliced off the bow and headgear as she did. I see nothing sustaining the theory urged in behalf of the schooner which is deducible from the wound to the schooner produced by the blow.

It is urged that because at the moment of the collision the second officer of

the steamer says he did discern the red light the steamer must have been approaching the schooner from forward of the schooner's beam. I do not think it necessarily so follows. The steamer was running forward on the schooner, and may have opened the light to the second officer by running past the screen. The bow of the steamer may have already struck the forward rigging and disturbed the screen, or the second officer, being high up above the schooner's deck, may have looked down on the light from above. I must further say that there is some doubt cast upon the schooner's case by the discrepancies between the testimony of the master and owner at the investigation before the steamboat inspectors and his statements in court.

Upon the whole case, I find that the schooner was in fault, in that she was heading in such a direction that the steamer was coming up more than two points abaft her beam and unable to see her side lights, and that the schooner did not make known her presence by exhibiting a white light or flare-up light from her stern.

I find the schooner solely in fault.

J. Kemp Bartlett and Robert H. Smith, for appellants.
Arthur D. Foster and Reuben C. Foster, for appellee.

Before PRITCHARD, Circuit Judge, and BRAWLEY and BOYD, District Judges.

PER CURIAM. The decree of the court below dismissing the libel of George H. White, master and owner of the schooner Amelia M. Price, is affirmed.

In so far as said decree awards damages to the steamship Baltimore for the injuries sustained by said steamship in the collision, and orders execution against George H. White, the owner of the schooner, said decree is reversed, the costs in this court to be divided.